ams/lml

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
|                     Plaintiff, | ) |
|     vs. | )    **Case No.  02-40140-02-JAR** |
| | ) |
| | ) |
| DAVID C. WITTIG, | ) |
| | ) |
|                     Defendant. | ) |
| _____ | ) |

## MEMORANDUM AND ORDER

By order of the Tenth Circuit filed November 22, 2006, this case was remanded to this

Court for resentencing.  A sentencing hearing was held on February 5, 2006.  After admitting

evidence and hearing arguments and statements of counsel, the Court made extensive rulings

from the bench.  The Court now issues the following statement of reasons, pursuant to 18 U.S.C.

§ 3553(c), memorializing its rulings on objections to the presentence report ("PSR") and on the

issues raised in the parties' sentencing memoranda.[1]  For the reasons stated on the record and as

supplemented herein, the Court sentences defendant to a term of 24 months' imprisonment.

### I.     Procedural History

The underlying facts of this case are well recited in a published opinion by the Tenth

Circuit, *United States v. Weidner*[2] ("*Wittig I*"), and will not be repeated here, except as necessary

to explain the Court's ruling.  Highly summarized, this case involved a nominee loan between

---

[1]On January 10, 2007, Wittig filed a Motion to Expedite Sentencing Hearing and for Release on Conditions (Doc. 346).  The Court addresses the appeal bond in this case in a separate order.

[2]437 F.3d 1023 (10th Cir. 2006) [hereinafter "*Wittig I*"].

defendant David Wittig and the President and General Counsel of Capital City Bank (the

"Bank"), co-defendant Clinton Odell Weidner, that was concealed by false documents submitted

to the Bank by both men.  After a jury trial, both defendant Wittig and co-defendant Weidner

were convicted of conspiracy [18 U.S.C. § 371], bank fraud [18 U.S.C. § 1005], and money

laundering [18 U.S.C. § 1957].  Because of the protracted nature of the post-trial proceedings,

however, a review of the procedural history is instructive.

###### A.    First Sentencing—February 27, 2004

In its first sentence, this Court found a base offense level of 6 under U.S.S.G. § 2B1.1(a)

(2001).  The Court enhanced that offense level under two provisions: (1) by finding an "intended

loss" to the Bank of $1.5 million, the Court enhanced the offense level by 16 under §

2B1.1(b)(1)(I); and (2) by applying the "gross receipts enhancement" of § 2B1.1(b)(12)(A),

which applies if the defendant "derived more than $1 million in gross receipts from one or more

financial institutions as a result of the offense."  The gross receipts provision required an offense

level of at least 24, regardless of the intended loss enhancement.  The Court applied the gross

receipts enhancement to both Wittig and Weidner for the same $1.5 million in nominee loan

proceeds, resulting in a total offense level of 24.  Based on defendant Wittig's criminal history

calculation of I, his resulting sentencing range was 51-63 months' imprisonment.  The Court

sentenced defendant Wittig to 51 months' imprisonment and fined him $1 million.  The Court

imposed a 78-month sentence on co-defendant Weidner after imposing enhancements for abuse

of trust based on his position with the Bank and obstruction for providing false testimony during

the sentencing hearing.  The Court granted defendant Wittig's appeal bond request, and he

appealed his convictions and his sentence.

On December 3, 2003, the United States filed an Indictment against defendant Wittig and Douglas Lake on charges relating to their employment at Westar Energy, Inc., *United States v. Wittig*, Case No. 03-40142-JAR (the "Westar case").  The first trial of the Westar case commenced October 12, 2004, and ended December 20, 2004, with a hung jury on all counts resulting in the declaration of a mistrial.  Retrial commenced June 14, 2005, and concluded September 15, 2005, with defendant Wittig convicted on all 39 counts, and Lake convicted of 30 counts.  The jury also returned partial forfeiture verdicts.  The Court imposed a 216-month (18 year) sentence on defendant Wittig and a 180-month (15 year) sentence on co-defendant Lake in the Westar case.  These convictions were recently reversed by the Tenth Circuit, with remand of some counts, for potential retrial.[3]

### B.      First Tenth Circuit Remand for Resentencing

On February 16, 2006, the Tenth Circuit (<u>Henry</u>, Lucero, JJ.; Brack, D.J.) affirmed both Wittig and Weidner's convictions, but remanded for resentencing.[4]

### 1.      Gross Receipts

The court in *Wittig I* first ruled that this Court erred in applying the gross receipts enhancement because it applied the same $1.5 million gross receipts to both Wittig and Weidner. The court cited the Guideline commentary that the enhancement was to apply "if the gross receipts to the defendant individually, rather than to all participants, exceeded $1,000,000."[5] After discussing the case law cited by the parties in support of their respective positions, the

---

[3]*United States v. Lake*, —F.3d—, 2007 WL 30038 (10th Cir. Jan. 5, 2007).  The government has been granted until February 20, 2007, to seek a petition for rehearing.

[4]*Wittig I*, 437 F.3d 1023 (10th Cir. 2006).

[5]*Id*. at 1045–47 (citing U.S.S.G. § 2B1.1 cmt. n.9 (2001)).

court stated:

> In our view, the various decisions cited by Mr. Wittig and the government are distinguishable from the instant case in important respects. The decisions upon which Mr. Wittig relies do indicate that the same receipts cannot be counted against more than one defendant. However, unlike this case against Mr. Wittig and Mr. Weidner, none of these cases involved a series of offenses in which each defendant successively used the receipts in a separate fashion (with one defendant, Mr. Wittig, obtaining money from a bank and then earning interest by loaning that money to his codefendant Mr. Weidner, and the codefendant, Mr. Weidner, using the proceeds of the loan to profit from a real estate investment).
>
> Conversely, the Third Circuit decision on which the government relies does not involve the attribution of the same receipts to codefendants or to the defendant and another person who somehow participated in the criminal scheme. In *Bennett*, the defendant argued that he did not receive certain receipts of the offense of conviction "because he subsequently transferred much of the money to consultants and others who did work for [his company]." In rejecting that argument, the Third Circuit did state that "it is irrelevant how [the defendant] spent the money after he obtained it." However, there is no indication in the Third Circuit's opinion that the individuals to whom the defendant transferred the receipts were codefendants or otherwise participated in the criminal scheme. Thus, *Bennett* does not offer the government a way around the Guideline language stating that the sentencing court may consider "gross receipts to the defendant individually, rather than to all *participants*."[6]

The court went on to rule that

> In light of the ambiguity of the Guideline language, the lack of case law resolving the issue of how to attribute receipts in these circumstances, and the lack of persuasive argument from the government, we conclude that the district court erred in attributing the $1.5 million in gross receipts to both Mr. Wittig and Mr.

---

[6]*Id.* at 1046 (quoting *United States v. Bennett*, 161 F.3d 171, 193 (3d Cir. 1998); U.S.S.G. § 2B1.1 cmt. n.9 (2001) (emphasis added)).

Weidner.[7]

In so ruling, the court noted in footnote 2 that the government also argued in its appellate brief that Wittig obtained additional gross receipts from the offenses.

> The government cites interest on the promissory note from Mr. Weidner (more than $90,000) as well as the two additional $500,000 increases in his line of credit that Mr. Wittig obtained in May and June 2001.  However, the district court did not rely on these transactions in determining the amount of gross receipts received by Mr. Wittig, and we decline to consider these transactions for the first time on appeal.[8]

Finally, with respect to gross receipts, the court observed that in the post-*Booker* regime, the district court, in determining the "nature and circumstances of the offense" under 18 U.S.C. § 3553(a), could consider that both defendants used the $1.5 million:

> The § 3553 factors include "the nature and circumstances of the offense."  In our view, the circumstances of these offenses include those noted by the government here—that Mr. Wittig and Mr. Weidner each used the $1.5 million from the line of credit increase in different ways and derived some benefit from it.  Thus, the district court may properly consider this aspect of the offenses in resentencing under the post-*Booker* regime.[9]

## 2.    Intended Loss

The court in *Wittig I* also found that in adding 16 levels to the base offense level established by an "intended loss" to the Bank of $1.5 million, this Court failed to adequately consider the collateral that defendant Wittig had pledged to secure his line of credit.[10]  The court

---

[7]*Id*. at 1046–47 (citing *United States v. Gay*, 240 F.3d 1222, 1232 (10th Cir. 2001) ("The rule of lenity requires courts to interpret ambiguous statutes, including the Sentencing Guidelines, in favor of criminal defendants.")).

[8]*Id*. at 1047 n.2 (internal citation omitted).

[9]*Id*. (internal citation omitted).

[10]*Id*. at 1048.

5

stated:

> Although there are instances in which a district court may ignore collateral in determining intended loss, the court must first determine that the defendant intended to deprive the lender of its collateral. The district court did not make such findings. The facts noted by the district court—that Mr. Wittig provided no new collateral for the $1.5 million increase in his line of credit and that amount of collateral provided did not comport with the bank's rules—might justify the disregard of some of the collateral pledged. However, absent further explanation and findings, we cannot see how those facts justify a disregard of *all* the collateral pledged by Mr. Wittig in calculating the amount of intended loss.[11]

### C.   *First Resentencing on Remand—April 24, 2006*

On resentencing, this Court once again applied the gross receipts enhancement to find an offense level of 24. In so doing, the Court reasoned that the *Wittig I* decision did not preclude this enhancement, provided the Court articulated the separate and individual use defendant Wittig made of the $1.5 million. The Court also reapplied the same intended loss calculation, this time after explicitly stating that it was considering the collateral defendant Wittig had pledged to secure the line of credit.

With respect to gross receipts, the Court stated that it interpreted the decision in *Wittig I* to say that under the Guidelines, the gross receipts enhancement could not be applied because the Court "did not articulate separate and independent and individual use of the gross receipts."[12] The Court disagreed with the defendant that *Wittig I* made clear that the rule of lenity would require only one defendant be attributed with those gross receipts.[13] The Court went on to find

---

[11]*Id.* (emphasis in original).

[12](Tr., Doc. 337 at 10.)

[13](*Id.* at 11.)

6

that defendants Wittig and Weidner treated the $1.5 million in "very different, separate, independent, and individual manners."[14]  Specifically,

> Wittig used this $1.5 million to increase his line of credit at Capital City Bank by $1.5 million so that forevermore his lending power increased at that institution by $1.5 million.  This increase bore interest at an annual rate of 5.39 percent.

> Weidner used the $1.5 million in gross receipts to fund an investment in a real estate venture in Arizona; with a profit motive, of course.[15]

The Court further noted that defendant Wittig used the $1.5 million in several manners. First, he received an increase in his line of credit, which he subsequently used for draws for other purposes.[16]  Second, he used the proceeds as a quid pro quo to obtain Weidner's help in getting a financing package for Wittig and others to buy into the Westar Industries' rights offering, an investment that Wittig projected would yield him $30 to $60 million of profit; this quid pro quo was an overt act in the conspiracy charge in the Westar case.[17]  Third, Wittig used the proceeds as a personal investment, in a loan to Weidner, with interest.[18]

After much analysis, the Court finally noted that:

> In any event, even if the $1.5 million is not properly attributed to Wittig under the gross receipts analysis, this is, as the Tenth Circuit noted, a factor concerning the nature and circumstances of the offense that warrants, in this Court's view, a sentence that comports with the guideline level applicable to an offense involving either an intended loss or a gross receipt by Wittig of

---

[14](*Id.* at 31.)

[15](*Id.* at 32.)

[16](*Id.* at 34.)

[17](*Id.*)

[18](*Id.* at 36.)

$1.5 million.[19]

With respect to intended loss, the Court noted that the collateral pledged constituted fruits of the fraud.[20]  To say that this line of credit was adequately secured would be to overlook the obvious, as it was secured with property that was subject to forfeiture in the Westar case.[21] The Court stressed that, in any event, the borrower's ability to pay is not an appropriate credit against intended loss, citing the so-called "rich man's credit."[22]  The Court acknowledged nevertheless that it must take into consideration the fact that there was collateral, stating:

> But in terms of the 3553 analysis, the Court also has to take into consideration the nature of the collateral pledged and the fact that it was the fruit of a fraud that defendant Wittig committed on Westar Energy.[23]

The Court went on to state that it also takes into consideration the intended loss with respect to Westar, noting that the very conduct that this defendant is being sentenced on was a part of the Westar case.[24]

Following its perceived guidance in *Wittig I*, the Court stated:

> So I am, in essence, applying both the gross receipts guideline and the intended loss guideline.  They are guidelines that can be applied in the alternative.  And I'm specifically finding that even if the gross receipts guideline did not apply or the intended loss would not apply, the underlying nature and circumstances that I've outlined in great detail here would still counsel this Court under

---

[19](*Id.* at 47.)

[20](*Id.* at 37.)

[21](*Id* at 38.)

[22](*Id.*)

[23](*Id.* at 39.)

[24](*Id.* at 39–40.)

3553 to apply the sentence that I'm about ready to announce.[25]

The Court then found an offense level of 24, a criminal history category of I, and imposed a sentence of 60 months' imprisonment and a $1 million fine.  The Court also reduced co-defendant Weidner's sentence from 78 months to 60 months.

The Court specifically discussed § 3553(a) factors in conjunction with its discussion of the Guideline analysis.  As noted above, the Court made clear that, even in the event the Guidelines did not apply, it would render the same sentence under the § 3553(a) factors.  In its announcement of sentence, however, the Court recited general language regarding the factors.[26]  The Court began by emphasizing its reliance on the Guidelines.[27]  It then noted defendant's failure to accept responsibility, evidence that he had engaged in new criminal behavior while on appeal bond, the lack of mitigating factors, and the seriousness of his offense.[28]  The Court expressed its belief that the sentence imposed promoted respect for the law and provided just punishment and that defendant's conduct justified a sentence the same length as Weidner's.[29]  Finally, the Court stated that the sentence would protect the public and deter further criminal behavior.[30]  Subsequently, there was an apparent administrative error in filing the Statement of Reasons, which left unmarked the section in which the Court must explain why it imposed a non-

---

[25](*Id.* at 48.)

[26](*Id.* at 50–55.)

[27](*Id.* at 51.)

[28](*Id.* at 52–54.)

[29](*Id.*)

[30](*Id.*)

9

Guideline sentence.[31]  In any event, the Court explained this in its oral ruling, which was recorded in a 66-page transcript of the sentencing hearing.[32]

### D.    Second Tenth Circuit Remand for Resentencing

In an unpublished decision dated November 22, 2006, the Tenth Circuit (Hartz, McWilliams and McConnell, JJ.) again reversed the Court's sentence and remanded for a third sentencing hearing.[33]

*Wittig II* begins by stating the two-step analysis for reviewing a sentence post-*Booker*: (1) it must determine whether the district court considered the applicable Guidelines range, reviewing its legal conclusions de novo and its factual findings for clear error; a non-harmless error in this calculation entitles the defendant to a remand for resentencing; and (2) if the district court correctly applied the Guidelines or any errors were harmless, the court considers whether the ultimate sentence was reasonable.[34]

### 1.    Guidelines Application

The court in *Wittig II* began its analysis by stating:

> We hold that the district court again erred in computing Mr. Wittig's offense level under the Guidelines.  The base offense level for Mr. Wittig's crime was 6.  The only potential grounds for increasing it would be the gross-receipts enhancement or the intended-loss enhancement.  *Neither ground applies.*[35]

---

[31](Doc. 315.)

[32](Doc. 337.)

[33]*United States v. Wittig*, No. 06-3166, 2006 WL 3378451 (10th Cir. Nov. 22, 2006) [hereinafter "*Wittig II*"].

[34]*United States v. Kristl*, 437 F.3d 1050, 1055 (10th Cir. 2006).

[35]*Wittig II*, 2006 WL 3378451, at *6 (emphasis added).

*Wittig II* agreed with defendant that the Court disregarded *Wittig I*'s holding and impermissibly reapplied a gross receipts enhancement to determine his offense level.[36]  *Wittig II* stated that this Court read *Wittig I*'s opinion to say that it was error to apply the $1.5 million in gross receipts to both defendants because "the district court did not articulate separate and independent and individual use of the gross receipts."[37]  *Wittig II* then explained,

> We do not share that reading. On the contrary, after noting the distinguishing factors in Mr. Wittig's case, we still proceeded to hold that Mr. Wittig was correct in challenging the applicability to his case of the gross-receipts guideline.  *The only use we permitted the district court to make of the "gross-receipts" facts on remand was to consider them under § 3553(a) to impose a non-Guidelines sentence.*[38]

As for intended loss, the parties disputed whether the Court also applied that enhancement in computing defendant's Guidelines offense level.  Defendant Wittig argued on appeal that the Statement of Reasons specifically found no intended loss under the Guidelines. The government pointed out that the Court had made such findings in its oral sentence pronounced at sentencing, and that should control over an inconsistent written sentence.  *Wittig II* noted, however, that that rule only applies to the sentence, not the explanation for the sentence.[39]

The court then stated,

> In any event, the evidence before the district court would not support an intended-loss enhancement.  In *Wittig I* we noted that

---

[36]*Id.*

[37]*Id.* (citation omitted).

[38]*Id.* (citation omitted) (emphasis added).

[39]*Id.*

Mr. Wittig's loan was collateralized and that to "ignore collateral in determining intended loss, the court must first determine that the defendant intended to deprive the lender of its collateral. . . .*The district court on remand made no finding of such an intent, there was no evidence that would support such a finding, and, indeed, we have been pointed to no evidence that Mr. Wittig intended the Bank to lose any money on its loan to him.*[40]

Thus, the court concluded, it was error for the Court to increase defendant Wittig's offense level above the base offense level of 6, and the Guidelines sentencing range of 0-6 months is well below his actual sentence of 60 months.[41]

### 2.    Harmless Error

The court in *Wittig II* was unpersuaded by the government's argument that the sentence should be affirmed because other factors make it reasonable and this Court said that it would impose the same sentence even if the gross receipts and intended loss enhancements did not apply.[42]

First, the court stated that "the reasonableness of the imposed sentence is irrelevant to the harmless-error analysis."[43]  This is because a defendant is harmed by a reasonable sentence if the court, absent the error, would have imposed a lesser, but still reasonable, sentence.[44]  Second, the court distinguished this case from those cases where the Circuit relied on a district court's expression of an alternative sentence in determining whether a *Booker* error was harmless.  "In those cases the district court had correctly calculated the Guidelines sentencing range**.**  The

---

[40]*Id.* (emphasis added).

[41]*Id.* at *7.

[42]*Id.*

[43]*Id.*

[44]*Id.*

question was only whether the district court, if it had known that it had discretion to vary from the Guidelines range, would have exercised that discretion."[45]

In this case, however, the government asked the court to assume that even if this Court had known that the sentence imposed was a "dramatic variance" from the highest possible Guidelines sentence, it would not have been influenced by that knowledge.  The court flatly rejected that argument, stating: "We lack the government's confidence in that assumption."[46] First, the court stated that it could not presume that this Court would not have been influenced by knowing that the sentence being imposed was 10 times as long as the maximum under the Guidelines.[47]  Moreover, this Court failed to explain what "dramatic facts" justified "such an extreme divergence from the best estimate of Congress's conception of reasonableness expressed in the Guidelines."[48]  Finally, the court directed this Court to "explain what the Guidelines failed to take into account and why that omitted factor is of such enormous consequence."[49]

The court proceeded to express doubt as to the relevance of the "considerations apparently relied upon" by this Court in imposing sentence.[50]  Specifically, the court noted there is no evidence to support a finding that Wittig intended a loss to the bank, and any intent to inflict loss on Westar is too tenuous to justify a variance.[51]  The court directed this Court to point

---

[45]*Id.*

[46]*Id.*

[47]*Id.*

[48]*Id.* (quoting *United States v. Cage*, 451 F.3d 585, 594 (10th Cir. 2006)).

[49]*Id.* (citing *United States v. Bishop*, 469 F.3d 896, 908–10 (10th Cir. 2006)).

[50]*Id.* at 8.

[51]*Id.*

to specific evidence regarding defendant Wittig's conviction in the Westar case to justify an increase.[52]  Finally, the court stated that the government had failed to point it to evidence of the quid pro quo arrangement with Weidner regarding financing the rights purchase, noting an apparent inconsistency between the claim that Weidner need such an inducement and the claim that such an offering was extremely advantageous to defendant Wittig.[53]

## II.      Analysis

### A.      Objections to Presentence Report

The Court previously ruled on objections to the PSR prepared for the first resentencing on April 24, 2006.  At the sentencing hearing, defendant Wittig renewed his objections to the PSR that were made prior to the first resentencing.  The Court makes the following rulings on the renewed objections:

### Government's Objection No. 1: obstruction of justice, ¶ 42

For the reasons set forth at the April 24, 2006, resentencing hearing, the Court overrules and denies this objection.

### Government's Objection No. 2: alternative calculation for receipt of gross proceeds of $1 million or more is not mentioned in the PSR, ¶ 51

The Court previously sustained this objection, but pursuant to the Tenth Circuit's decision in *Wittig II*, as discussed below, will overrule and deny this objection at this time.

### Defendant's Objection No. 1., enhancement for intended loss is incorrect, ¶ 51

The Court previously overruled this objection, but pursuant to the Tenth Circuit's

---

[52]*Id.*

[53]*Id.*

decision in *Wittig II*, as discussed below, will sustain this objection at this time.

### Defendant's Objection No. 2: enhancement for "proceeds" is incorrect, ¶ 52

The Court previously overruled this objection, but pursuant to the Tenth Circuit's decision in *Wittig II*, as discussed below, will sustain this objection at this time.

### Defendant's Objection No. 3: imposition of $1 million fine, ¶¶ 81–87

For the reasons set forth at the April 24, 2006, resentencing hearing, the Court overrules and denies this objection, and again imposes a fine of $1 million.[54]

### Defendant's Objection No. 4: guideline range of 51 to 63 months, ¶ 91

The Court previously overruled this objection, but pursuant to the Tenth Circuit's decision in *Wittig II*, as discussed below, will sustain this objection at this time.

### Defendant's Oral Objection: special condition of supervision, ¶ 105

At the February 5, 2007 sentencing hearing, defendant Wittig objected to the special condition of supervision that would prohibit him from being employed in any capacity in which he will have executive authority over a business, company or agency, or to engage in financial agreements or negotiations on behalf of any business, company or agency, without prior approval of the Court.  Defendant Wittig argued that the Court lacks authority to impose this special condition.

> The court may order, as a further condition of supervised release, to the extent that such condition—
>> (1) is reasonably related to the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), and (a)(2)(D);
>> (2) involves no greater deprivation of liberty than is reasonably necessary for the purposes set forth in section 3553(a)(2)(B), (a)(2)(C), and (a)(2)(D); and

---

[54]The statutory maximum fine for a violation of 18 U.S.C. § 1005 is $1,000,000 and the Guidelines allow for the Court to impose a fine up to the statutory maximum fine.  U.S.S.G. § 5E1.2(c)(4) (2001).

(3) is consistent with any pertinent policy statements issued
by the Sentencing Commission pursuant to 28 U.S.C.
994(a);
any condition set forth as a discretionary condition of probation in
section 3563(b)(1) through (b)(10) and (b)(12) through (b)(20),
and any other condition it considers to be appropriate. [55]

Section 3563(b)(5) allows for a condition that the defendant

refrain, in the case of an individual, from engaging in a specified
occupation, business, or profession bearing a reasonably direct
relationship to the conduct constituting the offense, or engage in
such a specified occupation, business, or profession only to a
stated degree or under stated circumstances.[56]

Defendant has now supplemented his objection in writing (Doc. 356) and argues that there is no

reasonable nexus between this case and the  condition set forth in paragraph 105 of the PSR.

The Court finds that these conditions of supervision are directly connected to the

underlying offenses for which defendant Wittig was convicted.  Defendant Wittig was convicted

of fraud and conspiracy to commit fraud that involved financial transactions.  Specifically, he

was found guilty in a scheme that involved false and misleading statements made on financial

documents.  If defendant Wittig were to have executive authority, or conduct financial

transactions on behalf of a business entity, he would be responsible for a multitude of financial

documents.  As a result, the conditions are reasonably related to the nature and circumstances of

the offense and the history and characteristics of this defendant.[57]

Furthermore, the Court finds that these conditions do not involve a greater deprivation of

---

[55]18 U.S.C. § 3583(d).

[56]*See also* U.S.S.G. § 5F1.5.

[57]*See* 18 U.S.C. § 3553(a); *United States v. Hopson*, No. 06-5012,  2006 WL 3095883, at *3 (10th Cir. Nov.
3, 2006).

liberty or property than is necessary.  Defendant Wittig is not prohibited entirely from engaging

in the activities set forth in paragraph 105; he simply must obtain permission from this Court

before doing so.  The Court overrules and denies this objection.

### B.    Advisory Guideline Range

In light of *Wittig II*, the new advisory guideline calculation is as follows:

| | |
|---|---|
| Base Offense Level, § 2B1.1(a) | 6 |
| Amount of Loss, § 2B1.1(b)(1)<br>(Intended loss) | 0 |
| Gross Receipts, § 2B1.1(b)(12) | 0 |
| Adjusted Offense Level | 6 |
| **Total Offense Level** | 6 |

Prior to the last resentencing, the Court calculated the offense level by attributing 16

points under the intended loss guideline and 2 more points for gross receipts, for a total offense

level of 24.  With a Criminal History category of I, the advisory guideline range was 51-63

months.  The Court resentenced Wittig to 60 months, a 900% increase from the applicable 6

month advisory guideline maximum sentence.

### 1.    Law of the Case/Scope of Remand

The government all but disregards the decision in *Wittig II*, instead focusing its

discussion on *Wittig I*.  The government asserts a "law of the case" argument while seeming to

suggest that the fact that *Wittig I* was published somehow controls the second, unpublished

opinion.[58]  As the government notes in its sentencing memorandum, an exception to the law of

the case doctrine exists when controlling authority has subsequently made a contrary decision of

the law applicable to such issues.[59]  In this case, *Wittig II* specifically clarified that the Court

misread *Wittig I* with respect to application of the gross receipts enhancement.  *Wittig II* went

even further, however, definitively stating that neither the gross receipts nor intended loss

enhancement applies.  *Wittig II* clearly ruled that the applicable Guidelines range in this case is

0-6 months when it so stated.  As noted in all Orders and Judgments, the fact that *Wittig II* is

unpublished merely means it is not binding precedent, except under the doctrines of law of the

case, res judicata and collateral estoppel.  Thus, it is controlling authority in this case.

   As a general matter, resentencing on remand is done de novo.[60]  Thus, when an appellate

court vacates and remands for a defendant's resentencing, lower courts must allow the defendant

any procedural rights afforded to him at sentencing in the first instance.[61]  The appellate court

may, however, limit district court discretion on remand pursuant to the mandate rule.[62]  This rule

requires the district court to exercise its discretion in conformity with the appellate court's

remand.[63]  Tenth Circuit case law requires that the appellate court be specific if it intends to limit

---

[58](Doc. 348 at 7–14.)

[59]*United States v. Monsisvais*, 946 F.2d 114, 117 (10th Cir. 1991).

[60]*United States v. Keifer*, 198 F.3d 798, 801 (10th Cir. 1999).

[61]*United States v. Smith*, 930 F.2d 1450, 1456 (10th Cir. 1991) (referencing Fed. R. Crim. P. 32(a)(1)).

[62]*Id.*

[63]*United States v. Hicks*, 146 F.3d 1198, 1200 (10th Cir. 1998).

a district court's discretion on remand for resentencing.[64]  The Circuit has also held that district courts should depart from appellate court mandates only in cases of "exceptional circumstances," such as when a blatant error would result in "serious injustice."[65]  The mandate rule is closely related to the law of the case doctrine cited by the government.  The law of the case doctrine requires that findings made at one point in litigation may not be contested at a later stage, except under limited circumstances.[66]

The Court disagrees with the government's suggestion that the panel in *Wittig II* ignored the law of the case and overruled the panel in *Wittig I*.  Moreover, for purposes of resentencing, the *Wittig II* the mandate is clear—neither enhancement applies.  Accordingly, since there are no justifiable enhancements, the base offense level is 6, with a Guideline sentencing range of 0-6 months.

The Court will briefly address the merits of the government's enhancement arguments.

**2.     Gross Receipts**

As to the gross receipts enhancement, the *Wittig II* panel interpreted the *Wittig I* panel as foreclosing any application of the gross receipts guideline except to consider the gross receipt facts under § 3553(a) in imposing a non-Guideline sentence.

The government argues that the Court can still arrive at an enhancement under a gross receipts theory based on the two $500,000 increases in defendant Wittig's credit line in May and

---

[64]*Compare United States v. Webb*, 98 F.3d 585, 587 (10th Cir. 1996) (panel gives direction to resentence defendant within range of 27 to 33 months) *with United States v. Davis*, 912 F.2d 1210, 1215 (10th Cir. 1990) (providing for general remand).

[65]*Webb*, 98 F.3d at 587.

[66]*Id.*

June 2001 and the $96,000 Wittig received in interest from Weidner.  The government interprets *Wittig I* as ruling that evidence demonstrated that separate and apart from the nominee loan proceeds of $1.5 million, Wittig derived more than $1 million in gross receipts from a financial institution based on these other transactions.  The government argues that key to this second resentencing is "the finding and ruling of Panel I that Wittig individually realized gross receipts of two draws from his line of credit, which had been increased to $6 million," as well as "in the form of interest payments from Weidner that he had obtained as part of the scheme."[67]

The government asserts that this Court did not address these additional gross receipts because it "obviously" believed that it was not necessary to do so, in reliance on guidance from *Wittig I* about using § 3553(a) to reach the same sentence on remand.  The government contends that *Wittig I* declined to consider these individually received gross receipts, plus gross receipts of interest earned, because the Court did not rely upon it in the first sentencing.  The government asserts that this Court "can correct this on resentencing."

Defendant responds that the two draws by Wittig from his line of credit, were unrelated to the nominee loan that formed the basis of the offense conduct and that they constituted normal bank activity.  Wittig argues that under the language of the gross receipts enhancement, these transactions fail to constitute gross receipts because they were not derived *as a result of* the offense.

While it is true that *Wittig I* made factual findings regarding the line of credit increases and interest payments, it is quite a leap to state that the court found that these were "additional gross receipts."  Indeed, *Wittig I* declined to specifically address these receipts that were

---

[67](Doc. 348 at 11.)

individually received by Wittig and distinct from the $1.5 million nominee loan proceeds, as set

out in footnote 2 of that opinion.[68]  *Wittig I* did discuss the significance of this evidence, but in

the context of upholding defendant Wittig's conspiracy conviction:

> Another aspect of that change in terms agreement supports the
> government's contention that Mr. Wittig was involved in
> concealing the loan to Mr. Weidner.  Although the April 27, 2001
> loan proposal prepared by Ms. Gurney requested an increase in the
> line of credit from $3.5 million to $5 million, Mr. Wittig sought to
> modify the request by deleting the $5 million figure on the change
> in terms agreement and writing in $6 million.  *The fact that Mr.*
> *Wittig sought and obtained two additional $500,000 line of credit*
> *increases shortly thereafter permits the inference that, in making*
> *the request for $6 million on April 27, Mr. Wittig sought to obtain*
> *$1.5 million for Mr. Weidner and $1 million for himself through*
> *one single line of credit increase and that he sought to do so*
> *without disclosing that part of the requested increase was for Mr.*
> *Weidner.*[69]

USSG § 2B1.1(b)(12) states:

> (Apply the greater) If—
>
> (A) the defendant derived more than $1,000,000 in gross receipts
> from one or more financial institutions as a result of the offense,
> increase by 2 levels; or
>
> (B) the offense substantially jeopardized the safety and soundness
> of a financial institution, increase by 4 levels.
>
> If the resulting offense level determined under subdivision (A) or
> (B) is less than level 24, increase to level 24.

The government has failed to provide any evidence that these two subsequent draws were "the

result of" the offense to make this enhancement viable.  The language in *Wittig I* is not

conclusive that the two increases in Wittig's credit line are the result of the offense, only that

---

[68]*Wittig I*, 437 F.3d 1023, 1047 n.2 (10th Cir. 2006).

[69]*Id.* at 1035 (emphasis added).

they were tied to the single line of credit increase in the terms of agreement.  There is no evidence that this was tied to the nominee loan such that it was "a result of the offense."  The Court declines to apply this enhancement to defendant Wittig's base offense level.

### 3.     Intended Loss

The Circuit concluded that the evidence before this Court could not support an intended loss enhancement because the $1.5 million loan was collateralized and in order to ignore the collateral, this Court was required to find that defendant Wittig intended to deprive Capital City Bank of its collateral.  The Circuit held that the Court failed to make this finding, and said that there was no evidence before the district court to support intended loss based on the nominee loan.

The government asserts that the Court can still find that defendant Wittig intended a loss of more than $1.6 million because the collateral for the loan was impaired and was obtained by fraud.  The government interprets *Wittig I* to mean that if the Court "considered the extent of the available collateral, it could use the deficiency of the collateral to find an 'intended loss.'"[70]  As such, the government essentially maintains *Wittig II* misinterpreted *Wittig I* in holding that the district court could not enhance Wittig's offense level based on the fact that the loan was undercollateralized.  At the hearing, the government admitted several documents and portions of transcripts as evidence in support of its argument.[71]  The government points to banker Bob Kobbeman's affidavit that the line of credit had a $1.6 million collateral deficiency and that the Court should disregard any reparations made by Wittig after the fraudulent nominee loan was

---

[70](Doc. 348 at 19.)

[71]Government's Exhibits 1 through 9 were entered over defendant's continuing objection as to relevance and completeness.

discovered.

Defendant maintains both that the loan was collateralized and that Wittig intended no loss to the bank.  Defendant points to Trial Exhibits 5 through 7 as evidence of the collateral he provided to secure the loans.  Further, Wittig's actions were consistent in demonstrating his desire to secure the obligations.  Defendant points to Christy Gurney's testimony and complains that Kobbeman's affidavit is inconsistent with his trial testimony and is new non-trial evidence.

The Tenth Circuit ruled in both *Wittig I* and *Wittig II* that before it can ignore collateral in determining intended loss, the district court must first determine that the defendant intended to deprive the lender of its collateral.  The Court notes that in *Wittig I*, the government chose not to argue in support of the Court's disregard of the collateral provided by defendant Wittig, instead arguing only that the amount of loss determination is proper under the gross receipts approach.[72] The Circuit ruled in *Wittig II* that the Court on remand had made no finding of such an intent, that there was no evidence that would support such a finding, and that the government had pointed to no evidence that Wittig intended the Bank to lose any money on its loan to him.[73]  The Court declines to read *Wittig I* as the government urges, that is, permitting this Court to adjust the offense level upward based on the under-collateralized loan extension.  Certainly, *Wittig II* does not invite this result.  The government offers nothing by way of new evidence that changes the appellate conclusion on this issue or warrants disregard of the clearly stated mandate.

**C.    *Variance Factors under § 3553(a)***

---

[72]*Wittig I*, 437 F.3d at 1048.

[73]*Wittig II*, No. 06-3166, 2006 WL 3378451, at *6 (10th Cir. Nov. 22, 2006)

### 1.    Law of the Case/Scope of Remand

The remand on the variance issues was not as specific as it was on the Guidelines issues. The language of *Wittig II* certainly invites this Court on remand to make a § 3553 variance analysis, with the provision that this time, any such variance should be tied to the correct Guidelines sentence of 0-6 months.   Moreover, the court in *Wittig II* urged this Court to explain what "dramatic facts" justified "such an extreme divergence from the best estimate of Congress's conception of reasonableness expressed in the Guidelines"[74] as well as "what the Guidelines failed to take into account and why that omitted factor is of such enormous consequence."[75]  The court also questioned the relevance of several factors relied on by the Court in its first resentencing.  This language, however, does not appear to limit this Court's discretion, but explicitly advises it to consider the statutory factors in determining a variance.  The fact that *Wittig II* invites this Court to explain what facts justify any divergence from the Guideline sentence should not lead to the conclusion that the appellate court foreclosed a variance sentence, as long as it comports with the parameters set out by *Wittig II*.

### 2.  Variance Analysis—Recent Circuit Decisions

After defendant was sentenced the first time, the Supreme Court decided *United States v. Booker*.[76]  In two separate majority opinions, the Court decided first, that the mandatory nature of the Guidelines violates the Sixth Amendment.[77]  Second, the Court decided that the

---

[74]*Id.* (quoting *United States v. Cage*, 451 F.3d 585, 594 (10th Cir. 2006)).

[75]*Id.* (citing *United States v. Bishop*, 471 F.3d 1162, 2006 WL 3237027, at *10 (10th Cir. Nov. 9, 2006)).

[76]543 U.S. 220 (2005).

[77]*Id.* at 224–25 (Stevens, J.).

appropriate remedy for this constitutional infirmity is to excise the provision from the

Sentencing Reform Act that requires district courts to apply the Guidelines.[78]  Instead, the Court

deemed the Guidelines advisory and explained that sentencing courts must now consider them

along with the sentencing goals set forth in 18 U.S.C. § 3553(a).[79]  The applicable standard of

_____

[78]*Id.* at 245, 259 (Breyer, J.).

[79]*Id.* at 259.  These factors include:
>    (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>    (2) the need for the sentence imposed—
>>        (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>        (B) to afford adequate deterrence to criminal conduct;
>>        (C) to protect the public from further crimes of the defendant; and
>>        (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>    (3) the kinds of sentences available;
>    (4) the kinds of sentence and the sentencing range established for—
>>        (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—
>>>            (i) issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and
>>>            (ii) that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; or
>>        (B) in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28);
>    (5) any pertinent policy statement—
>>        (A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and
>>        (B) that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.
>    (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>    (7) the need to provide restitution to any victims of the offense.

review under the new sentencing landscape is the reasonableness of the sentence.[80]  The Tenth

Circuit has since adopted the rule that a sentence within the advisory guideline range is entitled

to a presumption of reasonableness.[81]  The reasonableness inquiry has been even further

developed by the Tenth Circuit since the time of defendant's last re-sentencing on April 24,

2006.[82]

As an initial matter, the Court finds it necessary to set forth its understanding of the

Tenth Circuit's reasonableness inquiry, as set forth in recent opinions.[83]  In *United States v.

Cage*,[84] the court addressed for the first time what causes a sentence below the recommended

guidelines range to be unreasonable.[85]  The court explained that although the Guidelines are only

one of the factors listed in § 3553(a), they are "an expression of popular political will about

sentencing that is entitled to due consideration when we determine reasonableness."[86]  The court

went on to evaluate the discrepancy between the bottom of the properly calculated guideline

_____

18 U.S.C. § 3553(a).

[80] *Booker*, 543 U.S. at 261.

[81] *United States v. Kristl*, 437 F.3d 1050, 1054–55 (10th Cir. 2006).  The United States Supreme Court recently granted a petition for writ of certiorari to consider whether it is consistent with *Booker* to accord a presumption of reasonableness to within-Guidelines sentences.  *Rita v. United States*, 127 S. Ct. 551 (Nov. 3, 2006).

[82] As such, this Court obviously did not have the benefit of relying on more recent Tenth Circuit decisions such as *United States v. Bishop*, 469 F.3d 896 (10th Cir. Nov. 9, 2006).  *See Wittig II*, 2006 WL 3378451, at *7 (10th Cir. Nov. 22, 2006).

[83] The Court notes that the United States Supreme Court also recently granted a petition for writ of certiorari to consider whether it is consistent with *Booker* to require that a sentence that constitutes a substantial variance from the Guidelines be justified by extraordinary circumstances.  *Claiborne v. United States*, 127 S. Ct. 551 (Nov. 3, 2006).

[84] 451 F.3d 585 (10th Cir. 2006).

[85] *Id.* at 591.

[86] *Id.* at 593.

range in that case, which was 46 months, and the sentence actually imposed, which was six days.

The court deemed this discrepancy "both extraordinary and unreasonable for crimes of this

level."[87]  The court went on to explain:

> Because this case presents such an *extreme* divergence from the
> best estimate of Congress's conception of reasonableness
> expressed in the Guidelines, it should be considered reasonable
> only under *dramatic facts*.  Had the comparative difference been
> smaller but still outside the guidelines range, the district court's
> decision would not have been presumptively reasonable but an
> appropriate justification would suffice for this court to determine
> that it is reasonable.  However, where as here, a district court
> effectively ignores the advice of the Guidelines that the crimes of
> conspiracy to distribute methamphetamine and using a telephone
> to facilitate drug trafficking merit a substantial term in prison, we
> should only treat the actual sentence as being a reasonable
> application of § 3553(a) factors if the facts of the case are dramatic
> enough to justify such a divergence from the politically-derived
> guideline range.[88]

After considering the district court's reasons for imposing such a divergence from the guideline

sentence, the court concluded the district court erred in placing so much weight on factors such

as the defendant's avoidance of drug use, minimal criminal history, and single motherhood

status, which were not particularly uncommon factors.[89]  The court held that such an extreme

variance would have to be justified by § 3553(a) factors that are particular and individualized to

the defendant.[90]  As a result, the court held that these facts were not "dramatic enough to warrant

such an extreme downward variance" and reversed and remanded for resentencing.[91]

---

[87]*Id.* at 594.

[88]*Id.* at 594–95 (footnote omitted) (emphasis added).

[89]*Id.* at 596.

[90]*Id.*; *see also United States v. Bishop*, 469 F.3d 896, 906 (10th Cir. 2006) (construing *Cage*).

[91]*Id.*

27

On November 9, 2006, the Tenth Circuit filed two opinions that affirmed upward variances by applying *Cage*.[92]  In *United States v. Bishop*, the court explained that, in fashioning a sentence that varies from the Guidelines, the Tenth Circuit will look at whether it has some connection to the "guideposts created by the Sentencing Commission (such as criminal history points, offense characteristics, offense levels, etc.), [or] . . . another reasonable methodology in calculating the sentence. . . . [I]f a sentence that varies from the advisory Guidelines range is nevertheless tethered to the Guidelines themselves, we will likely consider this a reasonable methodology."[93]

In both *Bishop* and *United States v. Valtierra-Rojas*, the Circuit explained that the degree of compelling justification for a variance under the statute is proportional to the degree of difference between the advisory range and the sentence imposed.[94]  In other words, the court has established a sliding scale of magnitude of the divergence from the Guidelines and justification for doing so.  In so ruling, the court advises that district courts are to look at both the percentage of the divergence from the advisory guideline range and the amount of months above or below the guideline range.  Under this sliding scale analysis, the court has now evaluated three cases where an upward variance was upheld: (1) *Bishop*, where a divergence from the defendant's 57 month maximum guideline sentence to 78 months (37%) was found to be a "significant increase" requiring "sufficient explanation and justification,"[95] (2) *Valtierra-Rojas*, where a divergence

---

[92]*Bishop*, 469 F.3d at 906; *United States v. Valtierra-Rojas*, 468 F.3d 1235 (10th Cir. 2006).

[93]*Bishop*, 469 F.3d at 907.

[94]*Id* at 908; *Valtierra-Rojas*, 468 F.3d at 1239.

[95]*Bishop*, 469 F.3d at 908–10.

from the defendant's 27 month maximum guideline sentence to 60 months (122%) was found to be "substantial" and required "compelling reasons" to support the variance,[96] and (3) *United States v. Mateo*,[97] where a divergence from the defendant's maximum guideline sentence of 21 months to 120 months (471%) was found to be "extreme," like the sentence in *Cage*, and required a "'compelling' justification support by 'dramatic facts.'"[98]

In *Mateo*, the court expanded on its discussion in *Bishop* about the use of the Guidelines as a proper guidepost in determining an appropriate sentence under the § 3553(a) factors.  The district court in *Mateo* had compared the defendant's criminal history to that of an "armed career criminal," yet did not find the armed career criminal guideline to be applicable.  Instead, the court sought guidance from the armed career criminal statute in fashioning a sentence. The Tenth Circuit held:

> We cannot agree with Mr. Mateo's claim that the District Court's reference to the armed career criminal statute is inappropriate when considering what sentence to impose.  It is clear that the District Court did not apply the armed career criminal provision to Mr. Mateo because the minimum sentence applicable for such an offender is 15 years' (or 180 months') incarceration.  Rather, the sentencing transcript indicates that the court sought guidance from the armed career criminal provision as to the appropriate length of incarceration given Mr. Mateo's criminal history as disclosed by the unchallenged facts in the PSR.  The Guidelines are clearly relevant when determining an appropriate sentence, and in this case, the District Court's reference to the Guidelines in searching for a guidepost is not error.[99]

---

[96]*Valtierra-Rojas*, 468 F.3d at 1240–42.

[97]471 F.3d 1162 (10th Cir. 2006).

[98]*Id.* at 1170.

[99]*Id.* at 1168–69.

Judge Murphy wrote a concurrence to the *Mateo* decision and was joined by Judge Kelly.[100]  Although Judge Murphy and Judge Kelly agreed that the sentence imposed by the district court should be upheld as reasonable, they "question this court's developing insistence that district courts take extraordinary steps to justify sentences outside the range set out in the advisory Sentencing Guidelines."[101]  The concurrence points to the institutional advantage that district courts have in imposing sentences based on their exposure to numerous defendants.  The concurrence goes further and maintains that this new method for imposing variance sentences

> would appear to be an attempt to force the district courts to hew as close to the Guidelines range as possible.  It is odd, indeed to see how quickly the appellate standard of reasonableness set out in *Booker* has morphed into a mathematical exercise pegged exclusively to those sentencing factors in § 3553(a) relating to the advisory Guidelines.
> . . . .
>
> Although many might bemoan the decision in *Booker*, it is the law of the land.  The Guidelines are no longer mandatory and it is improper for this court to impose a system of appellate review that seeks to return this circuit, *de facto*, to a mandatory system.[102]

Judge Murphy also wrote a an order dissenting from the Tenth Circuit's denial of en banc review, and was joined by Judge Kelly and Judge Briscoe in *United States v. Atencio*.[103]  There, a three-judge panel imposed another procedural requirement on district courts: they must now provide pre-hearing notice under Fed. R. Crim. P. 32(h) and identify each ground the district

---

[100]*Id.* at 1171 (Murphy, J., concurring).

[101]*Id.*

[102]*Id.* at 1172–73.

[103]–F.3d–, 2007 WL 102977, at *1 (10th Cir. Jan. 17, 2007) (Murphy, J., dissenting to order den. en banc review).

court is considering in support of a variance sentence.[104]  The dissent to the order denying en

banc review wrote to express concern that the procedural limitations expressed in the *Atencio*

decision are "inconsistent with the post-*Booker* scheme; [and] occasions a significant, untoward

burden on the district courts in this Circuit."[105]

Having determined that defendant's advisory guidelines range is 0 to 6 months, this

Court now turns to a variance analysis, keeping in mind the framework of review in this circuit,

as described above.  In *Wittig II*, the Tenth Circuit found that this Court's prior sentence of 60

months was an "extreme" divergence from the advisory guideline maximum 6 month sentence

and that this Court had failed to articulate "dramatic facts" that justified "such an extreme

divergence from the best estimate of Congress's conception of reasonableness expressed in the

Guidelines."[106]  The court went on to advise this Court that it needed to explain what facts the

guideline range failed to take into account and why such omission justifies the extreme variance.

Because the Court now finds that the Guidelines do fail to take dramatic facts into account with

regard to this defendant, it will now turn to a discussion of those dramatic facts within the

framework of the factors set forth in § 3553(a).

### 3.      The Variance Factors

The Court now sets forth a justification for its decision to vary from the guideline range

and impose a sentence of 24 months.  This variance represents an 18 month and 300% disparity

from the maximum Guideline sentence of 6 months.  Based on the findings made in *Wittig II* and

---

[104]*Id.* at *8; *see* Part III *infra*.

[105]*Id.* at *2 (Murphy, J., dissenting to order den. en banc review).

[106]*Wittig II*, No. 06-3166, 2006 WL 3378451, at *7 (10th Cir. Nov. 22, 2006) (quoting *Cage*, 451 F.3d at 594.)

the Tenth Circuit's decisions regarding the sliding scale review of variance sentences, the Court

will justify its decision with dramatic facts that it finds warrants this "extreme" disparity.[107]  In

so doing, the Court focuses on facts particular to this defendant and determines that a term of

imprisonment of 24 months is sufficient, but not greater than necessary to comply with the

purposes set forth in the statute.

- **§ 3553(a)(1)—Nature and circumstances of the offense and the history and characteristics of the defendant; § 3553(a)(2)(A)—Need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.**

The Court finds that the Guidelines do not adequately account for the nature and

circumstances of this offense, or the seriousness of the offense, as they foreclose any recognition

that defendant received a benefit from the fraud he was convicted of.  The Court notes that it is

extremely unusual for a defendant to have a money laundering conviction without the amount of

laundered funds used to determine the offense level.  As a result, the Guidelines do not provide

for an appropriate incremental punishment to account for this defendant's involvement in a

scheme that resulted in a secret transfer of $1.5 million to a bank employee, after signing false

and misleading documents.  Both appellate panels have made clear that this Court may still

consider the facts relevant to the gross receipts enhancement analysis under § 3553(a).  Indeed,

the Circuit has determined that the language and application of the gross receipts enhancement is

ambiguous and therefore must give way to defendant's interpretation of the enhancement under a

---

[107]The Court notes that this range falls between the 471% discrepancy the Tenth Circuit has found to be "extreme" and the 122% discrepancy the Court has found to be "substantial."  *Compare Mateo*, 471 F.3d at 1170 *with United States v. Valtierra-Rojas*, 468 F.3d 1235, 1240 (10th Cir. 2006).  Although there is a chance that the Circuit will characterize this  discrepancy as substantial, requiring only "compelling" facts to justify it; as opposed to extreme, requiring "dramatic" facts, the Court nonetheless proceeds to analyze this as an extreme variance, explaining that the following facts, when taken together, are dramatic and justify an eighteen month, 300% upward variance.

straight Guideline analysis.[108]

But the Court now considers these gross receipts facts with regard to the nature and circumstances of the offense and finds that they warrant a variance, using the general fraud Guideline provision as a guidepost in determining the magnitude of that variance. The Court takes this opportunity to stress that it does not rely upon any facts related to the Westar case that was tried after defendant's initial sentencing and before his first resentencing.[109]

The *Wittig I* panel upheld Wittig's convictions in this case for bank fraud and conspiracy to commit bank fraud.[110]  In so doing, the Tenth Circuit affirmed Wittig's conviction under a *Pinkerton* conspiracy theory, which necessarily recognizes that he can be held liable for the reasonably foreseeable acts of co-defendant Weidner.[111]  Likewise, the Guidelines recognize that

---

[108]*See supra* notes 5–6, 35–36.

[109]The government makes much of *Wittig I*'s discussion of the government's evidence of a quid quo pro theory that defendant Wittig was making the loan of $1.5 million to curry favor with Weidner to support a $20 million loan package for Wittig and others to purchase stock in a new company formed from assets of the utility. While *Wittig I* discounted the importance of motive evidence in respect to the underlying convictions, it did concede that the evidence was of some relevance:

> The evidence of the lucrative benefits from the new utility company was of some relevance: it did indicate that Mr. Wittig had an interest in cultivating a good relationship with Mr. Weidner.  The evidence invoked by Mr. Wittig does not foreclose the government's allegation that Mr. Wittig sought to cultivate Mr. Weidner's good will and that one way of obtaining that good will was to loan Mr. Weidner the $1.5 million.  Moreover, Mr. Wittig has not established the necessary prejudice to warrant reversal of his conviction.

*Wittig I*, 437 F.3d 1028, 1043 (10th Cir. 2006) (footnote omitted).

In *Wittig II*, however, the court discussed the government's quid pro quo theory in the context of its relevance as a § 3553(a) variance factor.  The court stated that although the Court said there was evidence that Wittig's accomodation to Weidner was part of a quid pro quo arrangement in which the Bank would later loan Wittig and others sums necessary to exercise rights to purchase Westar stock, the government failed to point the court to that evidence.  As the Court stated, it does not rely upon any facts related to the Westar case in imposing a variance.

[110]*Wittig I*, 437 F.3d at 1032–45.

[111]*See id.* at 1038–39.

33

defendants should be sentenced based on all relevant conduct.[112]  Although the Court is foreclosed from considering intended loss with regard to Wittig, the Court need not ignore that Wittig intended to profit from the fraudulent scheme.  Wittig is the one who initially acquired the fraudulent loan and he signed false documents with regard to that loan.  Whether or not he intended to deprive the Bank of funds, he did intend to profit from the fraudulent conspiracy with co-defendant Weidner.  These facts are what led to his conviction, which has been affirmed.

The fraud Guidelines recognize that fraud involving a financial institution requires an enhanced penalty.[113]  Here, although the Guideline does not apply because the gross receipts from the nominee loan was attributed to co-defendant Weidner, the Court has previously found that this defendant retained separate and individual uses of these gross receipts.  Specifically, the Court found that Wittig used the $1.5 million increase in his line of credit at the Bank so that he could increase his lending power at the institution and that he was then able to draw from that increase for other purposes.  Wittig also used these proceeds as a personal investment, earning interest on the loan to Weidner in an amount greater than the interest he was paying on the line of credit at the bank.  Without Wittig's participation, this scheme could not have been executed. The Court doubts the Sentencing Commission intended to ignore such participation and such levels of proceeds when fashioning the fraud guidelines.  If these proceeds had been attributed to him under the Guidelines, defendant Wittig would have received a 24 offense level under a gross receipts analysis, resulting in a 51-63 month guideline range.  The Court finds, however that a more reasonable guidepost for determining the degree of the variance can be found in the loss

---

[112]U.S.S.G. § 1B1.3 (2001).

[113]*Id.* § 2B1.2(b)(12).

table for fraud, which does provide for incremental punishment.  For a $1.5 million loss, the table provides for a 16-level increase in offense level, which would result in a total offense level of 22.  This offense level, along with a Criminal History Category of I, renders an advisory guideline range of 41-51 months.  The Court neither applies the intended loss, nor the gross receipt enhancements, but believes that they express the intent of Congress that defendants involved in a  fraudulent scheme that involves a financial institution should receive a greater penalty.  The Guidelines, along with Wittig's relevant conduct convinces this Court that an extreme variance is warranted from the maximum Guidelines sentence of six months.

The Court finds that the Guidelines themselves provide some instruction on Congress's "conception of reasonableness" under these circumstances.  This Court attempts to tether its sentence to the Guidelines, albeit finding a lower term of custody of 24 months is sufficient, but not greater than necessary to comply with the purposes set forth in the statutory factors.

- **§ 3553(a)(6)—Need to avoid unwarranted sentence disparities among the defendants with similar records who have been found guilty of similar conduct.**

Under § 3553(a)(6), a district court must consider whether the sentence will create "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  "While similar offenders engaged in similar conduct should be sentenced equivalently, disparate sentences are allowed where the disparity is explicable by the facts on the record."[114]  A sentence of 41-51 months represents a Guideline range that would be applicable to *any* defendant who was convicted at trial of a fraud scheme involving $1.5 million, who received no other enhancements and had a criminal history category of I.

_____

[114]*United States v. Shaw*, 471 F.3d 1136, 1140 (10th Cir. 2006) (quoting *United States v. Goddard*, 929 F.2d 546, 550 (10th Cir. 1991)) (citation omitted).

The Court also considers the disparity between defendant Wittig and co-defendant Weidner's sentences.  Ordinarily, the disparity between co-defendants' sentences is not grounds for relief.[115]  But, as the Tenth Circuit recently explained, "where the court concludes that the Guidelines inadequately reflect a defendant's criminal history or the seriousness of the offense, a deviation may be appropriate."[116]

In this case, defendants' respective criminal histories are the same.  Both defendants were convicted of the same crimes—conspiracy and bank fraud.  Indeed, the Tenth Circuit specifically rejected Wittig's argument that a bank customer could not be prosecuted for bank fraud, holding that a bank customer may be convicted of bank fraud if he conspires with a bank official or aids and abets the official's violation of the statute.[117]  Defendants' conduct was jointly undertaken, and defendant Wittig knew what co-defendant Weidner intended to do with the money.  Both defendants filed documents with the Bank that failed to disclose the $1.5 million loan between them.[118]  Defendant Wittig was not merely a customer doing a favor for a bank officer—he purposely made a profit from what he knew was a fraudulent loan transaction in the form of a bank loan that he acquired then passed on to co-defendant Weidner.  As previously discussed, defendant Wittig and co-defendant Weidner each used the $1.5 million from the line of credit increase in different ways and derived some benefit from it.  Given these substantial similarities, the advisory Guideline range of 0-6 months for defendant Wittig does not properly account for

---

[115]*United States v. Davis*, 437 F.3d 989, 997 (10th Cir. 2006).

[116]*Shaw*, 471 F.3d at 1141.

[117]*Wittig I*, 437 F.3d at 1038.

[118]*Id.* at 1028–29.

all of the § 3553(a) factors relevant to his sentencing decision, in particular § 3553(a)(2)(A), which authorizes a nonguideline sentence if the guideline range does not adequately reflect the seriousness of the offense.  No explication of the facts could justify sentencing defendant Wittig under a sentence that in essence treats his culpability like a misdemeanor when, but for his collaboration and conduct that mirrored that of co-defendant Weidner, the crimes of conviction could not have been committed.  The Court finds that these are dramatic facts warranting an extreme variance from the Guideline range.

That being said, the Court also recognizes and accounts for the dissimilarities of the defendants, including the fact that co-defendant Weidner was a fiduciary of the Bank and that Weidner received an obstruction enhancement for giving false testimony at his sentencing hearing.  The Court also heeds the Tenth Circuit's recent ruling foreclosing the attribution of intended loss to defendant Wittig.  Because the Circuit clearly found that there was no evidence that defendant Wittig intended any loss to the Bank, his culpability is less than co-defendant Weidner, and thus some degree of disparity is warranted.  Co-defendant Weidner's sentence of 60 months reflects these differences, as it is two and one-half times as long as the sentence the Court seeks to impose on defendant Wittig.

In so ruling, the Court notes that, in its view, the disparity factor warrants a variance far closer to the 60-month sentence imposed on co-defendant Weidner.  Given the state of the law in this Circuit, however, the Court finds the degree of variance that can be justified under these dramatic facts is limited to 24 months.

As the Tenth Circuit recently explained in a case involving application of § 3553(a)(6), "[w]hile an adjustment based on a factor that was already built into the guideline calculation may

37

challenge the overall uniformity of sentences under § 3553(a)(6), any tension between subsection (a)(2)(A) and subsection (a)(6) can be resolved by the district court in light of all the facts before it, as long as it does so reasonably."[119]  For the reasons set forth above, defendant Wittig's Guideline calculation underestimates his culpability and creates unwarranted sentencing disparities, which the Court considers a dramatic fact justifying an extreme divergence from the Guideline range.[120]  The Court gives significant weight to this statutory factor when determining the magnitude of its variance from the guideline range.

- **§ 3553(a)(2)(B)—Need for the sentence imposed to afford adequate deterrence to criminal conduct.**

Finally, the Court notes that the Guideline sentence suggests that both this defendant and other defendants can avoid the consequences of bank fraud by structuring their transactions in a manner similar to this case.  A variance is necessary to afford adequate deterrence to bank customers who are aiders and abettors to nominee loans with bank officers because, but for the customer, the bank officer could not structure the fraudulent transaction.

The Court further notes that defendant Wittig has never acknowledged any responsibility for any of the conduct for which he has been convicted.  This has required the government to continually meet its burden of proof despite several instances that demonstrate overwhelming evidence of guilt.[121]  Furthermore, while on appeal bond, defendant Wittig transferred financial

---

[119]*Shaw*, 471 F.3d at 1141 (citing *United States v. Cage*, 451 F.3d 585, 595 (10th Cir. 2006) ("The problem with the sentencing decision, however, is not in the consideration of these factors; it is in the weight the district court placed on them.")).

[120]*Cage*, 451 F.3d at 595.

[121]At the sentencing hearing, defendant compared his sentence with that of a bank officer convicted of bank fraud, for whom this Court recently imposed a 12 month sentence.  Similarly, defendant suggested that upward variances are rare in fraud cases in this district.  Of course, the individualized and particular application of variance factors does not lend itself to comparison of defendants who committed *different* crimes.  One of many differences

assets in a manner that was in direct violation of an Order of this Court in both this and the Westar case.  However, the Court also notes that defendant Wittig has lived a significant portion of his life without incurring any other criminal convictions.  Although defendant's overall conduct could justify a higher sentence, the Court believes that 24 months should afford adequate deterrence and protect the public from further crimes of defendant.  The Court gives significant weight to this statutory factor in fashioning this variance sentence.

In sum, the Court has considered the factors set forth in § 3553(a) and determined that a variance from the advisory Guidelines range of 0-6 months is warranted.  Although the fraud enhancements for intended loss and gross receipts are not applicable under a Guidelines analysis, the Court finds them instructive in determining a variance sentence based on the nature and circumstances and seriousness of the offense.  The Court additionally gives significant weight to the need to avoid unwarranted disparities in sentencing and to afford adequate deterrence to criminal conduct.

The factors this court relies upon in determining a variance are not commonplace, but instead particular to defendant Wittig.  Indeed, the very lack of on-point case law referenced in *Wittig I* is a sign of how sufficiently uncommon these facts are that justify a divergence from the presumptively reasonable Guidelines sentence.  The Court, given the complex new landscape for sentencing in this Circuit, has done its best to fashion a sentence for this defendant that both attempts to honor Congress's intent in passing sentencing laws, and to recognize the other sentencing factors set forth in § 3553(a).  In so doing, it has primarily relied upon the Tenth Circuit's guidance that "[t]he Guidelines are clearly relevant when determining an appropriate

_____

defendant ignores in making such arguments is that many, in fact, most of the defendants convicted of fraud in this district, pleaded guilty; and their sentences reflect the mitigating factor of acceptance of responsibility.

sentence" under the variance factors.[122]

After due consideration to all relevant facts related to the nature and circumstances of the offense, the Court finds that compelling and extreme facts warrant a sentence of 24 months and that this sentence is sufficient, but not greater than necessary to comply with the Guidelines, the need for the sentence imposed to deter criminal conduct, and the need to avoid an unwarranted disparity of sentences between defendants with similar records and between this defendant and co-defendant Weider.

## III.    Notice

On January 16, 2007, the Court notified the parties pursuant to Fed. R. Crim. P. 32(h) that it was contemplating imposing a non-guideline sentence in this matter pursuant to the factors set forth in 18 U.S.C. § 3553(a)(1)–(6).  That same date, unbeknownst to the Court, the government filed its Sentencing Memorandum (Doc. 348), advocating a non-guideline sentence of 60 months.

On January 17, 2007, one day after this Court filed its Notice, the Tenth Circuit issued a decision for publication in *United States v. Atencio*,[123] for the first time holding that a district court must provide notice of its intent to vary from an advisory guideline range and "its contemplated reasons" for doing so under Fed. R. Crim. P. 32(h).[124]  The Tenth Circuit in *Atencio* reversed, in part, because neither the Presentence Investigation Report ("PSR") nor the

---

[122]*United States v. Mateo*, 471 F.3d, 1162, 1169 (10th Cir. 2006) (citing *United States v. Wolfe*, 435 F.3d 1289, 1304 n.12 (10th Cir. 2006) (analogizing to other Guidelines is the primary method of determining the reasonableness of a departure) (internal quotation omitted); *see also United States v. Bishop*, 469 F.3d 896, 910 (10th Cir. 2006) (upholding upward variance based on the fact that "the court used the advisory Guidelines as a tool for fashioning a reasonable sentence).

[123]—F.3d—, 2007 WL 102977 (10th Cir. Jan. 17, 2007).

[124]*Id*. at *8

40

district court identified the grounds upon which the upward variance was imposed in advance.[125]

Defendant Wittig then filed a Motion for Legally Sufficient Rule 32 Notice (Doc. 351), requesting that the Court set forth the grounds it was considering that may warrant imposition of a sentencing variance, in light of the court's decision in *Atencio*.  The Court granted defendant's motion on January 23, 2007, but noted that the supplementation was being given out of an abundance of caution, as it was not the Court's intent to rely on a ground not specified in its original Notice, in the PSR, or in the government's prehearing submission.

Defendant filed a Supplemental Motion for Additional Rule 32 Notice on January 24, 2007—two days before filing its Sentencing Memorandum (Doc. 354).  In his motion, defendant argues that this Court's January 23rd supplemental notice was insufficient under the standards enunciated in *Atencio*.  Specifically, defendant argued in this motion that the PSR does not provide appropriate notice of any basis for variance because it is based on a faulty Guidelines calculation, that the notice was not specific enough in its reference to facts involved in the "Westar fraud trial," and asked the Court to clarify its statement concerning how mitigating factors or argument provided in defendant's sentencing memorandum could necessitate another round of supplemental notice and briefing.[126]

After the Court announced its tentative sentence, in keeping with the practice of this and

---

[125]*Id.*

[126]The Court notes that it does not rely on any evidence regarding the Westar fraud trial in imposing its variance sentence.  The Court further notes that its reference in the previous supplemental notice to the possible need for further notice about mitigating factors was quite straightforward: had defendant presented the Court with *mitigating* factors in his sentencing memorandum that it was considering relying upon for a *downward* variance, it would require further notice under the holding in *Atencio*.  Based on this Court's tentative sentence, this is not the case.

most federal courts,[127] the Court found that notice of the exact grounds upon which this Court

intends to vary had now been provided.  *Atencio* provides the following procedure for a

defendant if he wishes to object to the lack of notice in imposing a variance:

> Upon objecting to the lack of notice, the defendant should then
> move for a continuance.  We will generally assume that a
> reasonable continuance cures Rule 32(h) error, rendering it
> harmless by allowing parties adequate time to prepare to contest or
> support the variance just as they could have, had they received
> notice prior to the sentencing hearing.  This procedure both
> promotes the "focused, adversarial resolution of the legal and
> factual [sentencing ] issues" contemplated by *Burns*, and avoids
> inefficient appellate litigation by permitting the court below to
> cure its error.[128]

Therefore, defendant has the option of either waiving any objection to Rule 32(h) notice, to the

extent that he argues a deficiency still exists, or move for a continuance to allow for additional

briefing on the variance grounds announced herein.

In light of the Court's variance ruling, defendant waived any such objection to Rule 32(h)

notice.  The government also waived any objection it might have.

**IT IS THEREFORE ORDERED BY THE COURT** that defendant David C. Wittig is

hereby sentenced to a term of imprisonment of 24 months, for all of the reasons set forth in this

written order.

**IT IS SO ORDERED**.

Dated this  _8th_ day of February 2007.

  S/ Julie A. Robinson

---

[127]*See* Fed. R. Civ. 32(i) (outlining the sentencing procedure which requires the Court to provide the
defendant an opportunity to produce evidence and argue objections to the presentence report or any other
controverted matter before the Court imposes sentence).

[128]*Atencio*, 2007 WL 102977, at *9 (quoting *United States v. Burns*, 501 U.S. 129, 137 (1991)).

Julie A. Robinson
United States District Judge